ORIGINAL

REISSUED FOR PUBLICATION
SEP 08 2016
OSM
U.S. COURT OF FEDERAL CLAIMS

# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 14-617V
Filed: August 11, 2016
Not to be Published

FILED
AUG 11 2016
OSM
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ELISABETH SMIRNIOTIS, | * | |
| Petitioner, | * | Menactra and Varicella vaccines; allergic reaction; autoimmune disease; encephalopathy; petitioner's expert not credible; dismissed for failure to prove causation in fact |
| v. | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

Andreas Smirniotis, Queens, NY, for petitioner (*pro se*).
Ann D. Martin, Washington, DC, for respondent.

**MILLMAN, Special Master**

## DECISION[1]

On July 16, 2014, the initial petitioners, Andreas and Angela Smirniotis, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that Menactra and Varicella vaccinations their daughter Elisabeth received on July 20, 2011 caused her an allergic reaction, autoimmune disease, and encephalopathy. Pet. at ¶ 19. On January 29, 2016, the undersigned issued an Order changing the caption to Elisabeth Smirniotis as petitioner had reached her majority. References to "petitioner" in this decision refer to Elisabeth. Petitioner's father Andreas Smirniotis by designation from petitioner, pursuant to CFC Rule 83.1(a)(3), represented petitioner once she reached her majority. Ex. 1, filed Apr. 25, 2016.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, the special master intends to post this decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. When such a decision is filed, petitioners have 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the categories listed above, the special master shall redact such material from public access.

On May 5, 2015, petitioner's counsel (before he withdrew) informed the undersigned during a telephonic status conference that he was having difficulty finding an immunologist to review the case. The undersigned recommended that counsel seek the services of a neurologist as that specialty would be more suited to opine on whether Menactra and Varicella vaccines cause schizophrenia. Petitioner's counsel agreed. From May 2015 until January 2016, petitioner's counsel was unable to find expert medical support for petitioner's allegations.

On February 3, 2016, petitioner's counsel filed a status report stating that petitioner had decided to proceed with her case and seek new counsel. On February 12, 2016, petitioner's counsel moved to withdraw, which motion the undersigned granted on the same day.

On March 30, 2016, the undersigned held a telephonic status conference with Andreas Smirniotis, acting on behalf of petitioner, and respondent. Mr. Smirniotis stated that Dr. Mittman was petitioner's expert.

On May 19, 2016, the undersigned filed by her leave a letter dated May 18, 2016 from Dr. Mittman stating that petitioner, four weeks post-vaccination, had psychological and neurological symptoms "which were consistent with Gamberey[2] Syndrome [sic]", including headache, mouth pulling, numbness and tingling of extremities, sinus pressure and anxiety. Med. recs. Ex. 20, at 1. He tested petitioner's skin on July 11, 2014 (three years after vaccination) and found her to be positive to Menactra. He tested her on skin on July 17, 2014 and found her to be positive to Varicella. Id.

On July 18, 2016, respondent filed her Rule 4(c) Report and Motion to Dismiss as well as the expert report of Dr. Shelby H. Josephs, an allergist and immunologist, and two articles. Resp't's Exs. A, B, and C.

Petitioner neither responded to respondent's motion to dismiss nor provided a responsive expert report from Dr. Mittman to respondent's expert Dr. Josephs' report.

The undersigned **DISMISSES** the petition for failure to make a prima facie case of causation in fact.

## FACTS

### Pre-Vaccination Records

Petitioner was born on October 17, 1997.

On July 20, 2011, before petitioner received Menactra and Varicella vaccinations, petitioner saw her pediatrician at Astoria Pediatric Associates, PC. Med. recs. Ex. 7, at 17. She was 5'2 ¾" tall and weighed 208 pounds, giving her a BMI of 36. She was diagnosed with

[2] Apparently, Dr. Mittman does not know how to spell Guillain-Barré.

obesity and had pronounced hirsutism. She complained of developing left hand numbness and pain. Id. She played the cello. She was diagnosed with joint pain and carpal tunnel syndrome, referred to an orthopedist, advised to use a stent and wrist guards, and recommended to take Advil. Her lab results were suggestive of her having metabolic syndrome. Id.

## Post-Vaccination Records

Petitioner received Menactra and Varicella vaccinations on July 20, 2011. Med. recs. Ex. 1, at 1, Ex. 7, at 5.

On July 22, 2011, petitioner went to NY Rehab, Pain Management & Medical Services, P.C., and saw RPA-C Lucia A. Gildea. Med. recs. Ex. 16, at 3. Petitioner complained of numbness and tingling in the first three digits of each hand. She reported a five-day history of numbness and tingling in the first three digits of both hands (which would put onset on July 18, 2011, or two days before she received Menactra and Varicella vaccines). She saw her pediatrician who referred her to an orthopedist, Dr. Theodor Grannaus, who saw petitioner on January 21, 2011. He referred her for physical therapy one to two times a week for mild bilateral carpal tunnel syndrome. Petitioner's mother told PA Gildea that petitioner played the cello and the onset of her numbness and tingling occurred suddenly on Monday, July 18, 2011. The numbness and tingling had improved throughout the week. Petitioner had no other complaints at that time. All systems reviewed were within normal limits. Id. All her muscles were within normal. Id. at 4. As for sensation, petitioner had areas of hypoesthesia to her C7 and C8 dermatomes and hyperesthesia to her digits one, two, three, and half of digit four. Id. at 5. PA Gildea's diagnosis was bilateral mild carpal tunnel syndrome and hyperesthesia of the C7-8 dermatomes bilaterally. Id. P.A. Gildea recommended petitioner wear bilateral wrist splints and begin physical therapy two times a week for four to six weeks, including electrical stimulation, therapeutic massage, ultrasound, therapeutic exercises, and hot and cold packs to treat the bilateral carpal tunnel syndrome. Id. at 6. She recommended strapping and laser treatment two times a week for four to six weeks to treat the bilateral carpal tunnel syndrome. Id.

One month after vaccination, on August 22, 2011, petitioner went to the emergency department of Sentara Virginia Beach General Hospital, complaining of chest pain, neck pain, coughing, and phlegm occurring the day before. Med. recs. Ex. 8, at 1, 2. Dr. Michael W. Pruitt considered pneumonia, arrhythmia, and anxiety. Id. Petitioner had a normal EKG and chest x-ray. She was well-appearing and conversational. She reported she had a sensation of her face drooping, but on examination, she did not have any asymmetry. She had a normal neurological examination. Id. Petitioner admitted to a lot of stress which was the likely cause of her symptoms. Id. Petitioner gave a history of discomfort in her chest which started the day before while she was at rest and had been constant since then. Id. at 4. She also reported the sensation of drooping of the left side of her face, neck, and chest. She reported she was under a lot of stress. She was overweight and her family pressured her to lose weight. On physical examination, she was negative for dizziness, seizures, weakness, lightheadedness, and headaches. Id. She was in no distress and was alert and oriented. Id. at 5. Her gait was normal. Id.

On September 2, 2011, petitioner went to Tisch Hospital – NYU Hospitals Center, complaining of a headache. Med. recs. Ex. 9, at 39. She complained of head pressure for two weeks. She had been on Augmentin for four days. The pressure was intermittent. She had a cough and congestion. She was obese. She had swollen turbinates, frontal sinus tenderness, maxillary sinus tenderness, and acanthosis nigricans (a skin condition). She had a normal neurological examination. Id. at 40. The diagnosis was sinusitis. Id.

Petitioner did not file any medical records dated between September 2, 2011 and May 6, 2014, a total of two years and eight months.

On May 6, 2014, Dr. Angelo D. Reppucci, a general and pediatric ENT, wrote a letter to Dr. Michael Iordanou, stating that petitioner had a history of chronic and persistent headache due to presumed recurrent sinusitis. Med. recs. Ex. 15, at 10. Several courses of antibiotics did not cause significant improvement. She had difficulty focusing in school and requested permission for home study. Id.

On May12, 2014, petitioner had a CT scan of her sinuses because of chronic sinusitis. Id. at 7. Because of variations in petitioner's anatomy, she was predisposed to having recurrent episodes of inflammatory sinus disease. Id. at 8.

On May16, 2014, petitioner saw Dr. F. David Hannanian, a neurologist, and complained of having headaches for two years. Med. recs. Ex. 10, at 2. She complained of numbness of her skull and paresthesias which lasted for hours. She also complained of upper back pain, radiating to the arm. She complained of poor organizational skills, decreased comprehension, and anxiety. On physical examination, she was awake, alert, attentive, and had intact naming, comprehension, and repetition. Id. Her EEG was normal. Id. at 3. Her BAER (brainstem auditory evoked response) was unremarkable for brainstem dysfunction, but she had acoustic and vestibular abnormalities. Dr. Hannanian diagnosed petitioner with headaches and vestibular dysfunction and prescribed an MRI, school psychological consultation, and Neurontin. Id.

From May 29 to June 30, 2014, petitioner was in The Zucker Hillside Hospital. Med. recs. Ex. 17, at 1. She was admitted through the ER for paranoia and delusional thinking with worsened functioning. Petitioner stated that a girl in her school who also played the cello had been using "supernatural power" to bully her. She said that this girl had put "bad thoughts" into her mind, reading what was in her mind, and "summoning everything behind it." Petitioner was not sure why this girl was doing this to her, but sometimes she felt that her life was in danger. Petitioner felt that this girl shared "the bad thought" petitioner had in her mind and had told her father about it. Petitioner was very vague and disorganized in explaining this, although on repeated questioning, she shared the content of "bad thoughts" such as images of genitalia, all kinds of words evoking fears, rape, etc. Petitioner stated that she had not been able to attend school for two months because "everybody is talking about me" and felt that her friend had leaked everything about her. She admitted to severing friendship with others because they thought she was crazy. She denied auditory, visual, and tactile hallucinations although she stated

she could hear what this girl was doing. Petitioner said she had a history of depression in her sophomore year (she was an 11th grader then) when "bullying" started to worsen with low mood, hypersomnia, poor appetite, hopelessness, poor concentration, low self-esteem, and intermittent suicidal ideation. Petitioner reported she had tried to cut her vein to die twice in her sophomore year but "something came to me" and she "just stopped." Petitioner also stated that her mood was different from what was exactly going on, stating that she could be "very happy" because she was in a happy world in which everything was okay. Upon further questioning, she stated she had an imaginary world where she felt happy. She endorsed the intermittent feeling that she did not need to sleep, two to three times a week, and felt irritable with racing thoughts. Id. Petitioner's parents reported that she told them this girl was "stalking and following her around" in February 2014. At that time, they could reason with petitioner and calm her. Petitioner started cutting her friends off around the same time and discontinued her Facebook account. She opened another one, but limited access to a handful of people. She had not been able to attend school after April 24, 2014 because of her fear that this girl would harass her. In the past few days, petitioner became agitated during the night and asked her parents to call this girl to tell her to stop what she was doing. Petitioner's parents were able to calm petitioner and she slept, although she woke early on May 29, 2014, ranting and raving that this girl was still talking to her and they should stop her. Petitioner accused this girl and the girl's mother of doing witchcraft and could not be controlled. Id. Petitioner started therapy two weeks earlier and reported that she started feeling "swishing" in her brain in eighth grade. Id. At discharge, petitioner had significantly improved in her functioning and had a decline in her psychotic symptoms. Id. at 3. But her prognosis was guarded given the degree of her symptoms at admission and continued experience of some psychotic symptoms. Id. Her discharge diagnosis was schizophreniform disorder, rule out schizophrenia, paranoid type, rule out schizoaffective disorder. Id. at 4.

On July 10, 2014, three years after petitioner received Menactra and Varicella vaccines, petitioner saw Dr. Robert J. Mittman, an adult and pediatric allergist. Med. recs. Ex. 14, at 3. He wrote that petitioner received Menactra and Varicella vaccines in 2011 and that was when her psychosis began. He put in parenthesis "sinuses?". Id. The history petitioner and her parents gave him was that six weeks after vaccination, she had headaches, mouth pulling, and numbness and tingling in all her extremities. Id. No cause was found. She had sinus pressure. She had stress at school, ADD, anxiety, and depression. Id. She had a sloshing sound in her head. Id. at 4. He noted she had severe hirsutism. Id. at 8. Dr. Mittman diagnosed petitioner with psychosis, vaccination reaction, Guillain-Barré Syndrome ("GBS"), and rule out PCOS. Id. Dr. Mittman tested petitioner for allergies by pricking her skin with Menactra, Varicella, and eggs. Id. at 9. He suggested she have a lumbar puncture to see if she had GBS (this was three years post-vaccination). Id.

On July 11, 2014, Dr. Mittman wrote that petitioner was allergic to tree pollen, grass pollen, weed pollen, mold spores, feathers, house dust, dust mites, English plantain, soybean, oranges, egg white, and Menactra. Med. recs. Ex. 4, at 1.

Also on July 11, 2014, petitioner went to the emergency department of North Shore-Long Island Jewish Health System, and told Dr. Joshua Kim that she had a headache and generalized

tingling and numbness. Med. recs. Ex. 12, at 1. Dr. Mittman had sent her there after giving her allergy testing that was positive for elevated Menactra levels that concerned him that petitioner might have GBS. In 2011, petitioner received Menactra. Four weeks later, in Virginia Beach, she noticed symptoms of tingling in her hands and feet and had a headache. She was taken to the ER and sent home. Her symptoms continued. Her primary medical doctor diagnosed petitioner with sinusitis and treated her with antibiotics, but her symptoms persisted. A CT scan was negative and she was referred to a neurologist who did an EEG that was reportedly normal. Petitioner's symptoms worsened and affected her psychologically. She was admitted to Zucker Hill for four weeks for psychosis. Petitioner went to the allergist after doing a personal investigation on the internet where allergy testing was done and Menactra levels were high. She stated her tingling was intermittent and progressed from her extremities to the rest of her body. Her past medical history included depression and psychosis. Id. On physical examination, petitioner did not have any focal deficits and no motor or sensory deficits. Id. at 2. She had a normal physical examination, and was alert, active, anxious-looking, and oriented. Id. She was to have an EEG on July 12, 2014. Id. at 3. The ED nurse's note states that petitioner complained of numbness and tingling in her hands and arms, and stiffness on the sides of her neck. Id. at 5. Petitioner's mother stated that petitioner was reacting to a Menactra vaccination given in 2011 as her immunologist told her. Id. Petitioner admitted to thoughts of suicide and self-harm. Id. She also had thoughts of violence toward others. Id. at 6. She could not say whom she wanted to hurt. Id.

On July 16, 2014, petitioner went to the emergency department of NYU Hospitals Center, and complained to Dr. Karen N. Goodman that she had tingling and felt a sensation of a blanket causing pressure on her head for two years. Med. recs. Ex. 9, at 9. She said she received Menactra vaccine in 2011 and developed tingling of her fingers the next day. Since then, she said she had been experiencing the headache and feeling a weird sensation of a blanket over her head. She said that neurology had worked up her condition with MRI and EEG after she fainted on multiple occasions. Her pain was attributed to her having a sinus infection. Petitioner said her symptoms began worsening in May and she thought she was hearing voices. She said she had been admitted to psychological care for one month and started on medications without improvement in her symptoms. She also said that immunology had tested her and found she had an allergy to Menactra vaccine. She had an appointment at the end of August 2014 for a lumbar puncture. That evening, petitioner complained of worsening symptoms and feeling as if there were a blanket over her head. Id. On physical examination, petitioner was dizzy and lightheaded and complained of headaches. Id. She said she sometimes heard voices but no words, just sounds. She was alert with a flat affect. Id.

Also on July 16, 2014, petitioner saw Dr. Aaron Geller, a neurologist. Id. at 12. She told him that for three years, she had a painful, pressure-like burning sensation over her right cranium associated with a dysesthetic scalp sensation she described as like a blanket on her head. This unpleasant sensation was part of a constellation of somatic and psychiatric symptoms which her family related started soon after receiving a meningitis vaccine for school, including auditory hallucinations of incomprehensible speech, psychosis which required inpatient psychiatric admission, and hirsutism. Petitioner's family said her immunologist diagnosed petitioner with an

allergic reaction to vaccine antigen and planned to arrange intrathecal immunoglobulin therapy. Petitioner's family said a non-contrast brain MRI in May 2014 was normal. Id. They said her allergies consisted of Menactra (causing psychosis and headaches), egg white (causing nausea), and soybean (also causing nausea). Id. at 13. On neurological examination, petitioner was awake and alert, and answered questions and followed commands appropriately. Id. at 14. She was oriented to time, place, and person. Her language was bradyphrenic. Her speech was fluent. Her prosody was dampened. Her naming, repetition, and comprehension were intact. Id. Petitioner had a flat affect. Id. Her recent and remote memory were normal. Her attention and concentration were normal. Petitioner refused to perform serial 7s, but was able to spell "world" backwards. She drew a clock correctly. Id. Dr. Geller's diagnosis was chronic headache. Id. at 16. Her examination was normal. Dr. Geller commented that, although petitioner described worsening of her chronic headache, she did not appear in any distress. Id.

On August 7, 2014, petitioner saw Dr. Vinay Kapoor, an endocrinologist, to determine if she had polycystic ovarian syndrome (PCOS). Med. recs. Ex. 14, at 11. He thought she most likely had PCOS. Id. Her testosterone level was high at 79.3 (normal range was less than 2.5 to 39.8). Id. at 14.

On August 31 2014, petitioner went to the emergency department of Long Island Jewish Hospital because of headache, reaction to a lumbar puncture, and disturbance of skin sensation. Med. recs. Ex. 12, at 11. She was also vomiting. Id. at 13. She had PCOS and schizoaffective disorder presenting with a longstanding history of headache and paresthesias involving the right lower extremity. Id. She had a lumbar puncture on August 29, 2014. She presented that day with headache and back pain that began after her lumbar puncture. She continued to complain of numbness of her right lower extremity. Id.

On December 2, 2014, Dr. Mittman wrote a "To whom it my [sic] concern" note saying that petitioner was reactive to Varicella vaccine on July 17, 2014 and to Menactra vaccine on July 11, 2014. Med. recs. Ex. 13, at 1. (Petitioner filed the same letter as Ex. 14, at 10.)

On December 4, 2014, the Long Island Jewish Hospital Psych Center discharged petitioner because they had not seen her in several months for treatment and she reported she was in treatment with a new provider for "phobia related to leaving the house." Med. recs. Ex. 17, at 6. Petitioner was being home schooled. Id. Petitioner attributed her prior suicidal ideation to depression during her sophomore year (2012-13) when classmates made fun of her. Id. at 7. Her parents said petitioner scratched herself like a cat. Petitioner said she was anxious and hyper during the interview with hospital staff and had a strange feeling in her stomach. Petitioner could not remain seated during the interview, frequently pacing, and requiring a break to calm down. Her eye contact was poor and she was unkempt. Petitioner's mother stated she had refused to wash her hair in four days, which she related to a classmate. Petitioner said she had heard three voices since late May which were there all the time, every day, engaging in a running commentary on her day, and disagreeing with each other. She said she could not explain what they were saying, but they were negative which made her feel frustrated and want to cry, kick, or scream. Petitioner said she wanted to get rid of her voices and was impatient because she wanted

to focus on her career, her cello, and her relationship with God. Petitioner also said she had tactile hallucinations of tingling and numbness in her arms, which also started in May 2014. She said she felt or heard a swishing around her head for some time without specifying the onset. She believed her classmate was performing witchcraft on her and had summoned Satan who made her look at God and anyone who looked at God died. Therefore, petitioner believed God was destroying her and she may die. She also stated that she had killed an angel in the past. She stated that her classmate had been able to read her mind since May 2014 but that she cannot read other people's minds. She said she felt paranoid about the future and thought she would die in her sleep. Petitioner and her parents requested ECT (electroconvulsive therapy during which small electric currents are passed through the brain, intentionally causing a brief seizure, changing brain chemistry in order to reverse symptoms of certain mental illnesses). Petitioner's parents had limited insight, insisting that petitioner was not developing schizophrenia and believing her illness was related to stress, anxiety, religious guilt, and potentially PCOS. Id. Petitioner's father had depression when he was younger. Petitioner's grades as a high school junior declined in spring 2014 as a result of her symptoms. Before then, she said she had an 86 average. Her chart indicated that petitioner was unable to attend school after April 24, 2014 because she was afraid a peer was harassing her. Id. Of petitioner's five medications, one was for anxiety and two were for schizophrenia. Id. at 8. Petitioner's discharge diagnosis was schizophreniform disorder, rule out schizophrenia, paranoid type, and schizoaffective disorder. Id.

## Respondent's Expert Report

Dr. Shelby H. Josephs, an allergist and immunologist, notes that petitioner did have tingling and numbness of her fingers (dysesthesia), which began before she received Menactra and Varicella vaccines. Ex. A, at 3. Petitioner was diagnosed with carpal tunnel syndrome and given physical therapy. After she received her vaccinations, she had no reaction whatsoever. The testing Dr. Mittman performed three years after vaccination was on her skin in order to find an immediate, i.e., allergic reaction, such as wheezing, swelling, hives, shortness of breath, vomiting, pain, or alteration of cardiovascular function, all of which occur within 15-20 minutes of the test. Id. at 2. Although Dr. Mittman wrote petitioner had skin reactions to Menactra and Varicella vaccines three years after vaccination, petitioner's contemporaneous medical records do not show any reaction to the vaccinations. Dr. Mittman interprets petitioner's history three years after vaccination of numbness and tingling as diagnostic of Guillain-Barré Syndrome, but she was never diagnosed with GBS and she never had symptoms of GBS. Id. at 2-3.

## DISCUSSION

To satisfy her burden of proving causation in fact, petitioner must prove by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of HHS, 418 F.3d 1274, 1278 (Fed. Cir. 2005). In Althen, the Federal Circuit quoted its opinion in Grant v. Secretary of Health and Human Services, 956 F.2d 1144, 1148 (Fed. Cir. 1992):

> A persuasive medical theory is demonstrated by "proof of a logical sequence of cause of and effect showing that the vaccination was the reason for the injury [,]" the logical sequence being supported by a "reputable medical or scientific explanation[,]" i.e., "evidence in the form of scientific studies or expert medical testimony[.]"

418 F.3d at 1278.

Without more, "evidence showing an absence of other causes does not meet petitioners' affirmative duty to show actual or legal causation." Grant, 956 F.2d at 1149. Mere temporal association is not sufficient to prove causation in fact. Id. at 1148.

Petitioner alleges allergic reaction, autoimmune disease, and encephalopathy. The contemporaneous medical records do not show she had allergic reaction to Menactra and/or Varicella vaccines. She did have a diagnosis of carpal tunnel syndrome which accounted for the numbness and tingling that predated her vaccinations by two days. She received physical therapy for carpal tunnel syndrome. Her subsequent 2011 medical and hospital visits for various complaints resulted in repeated neurological examinations that proved normal. What petitioner does have, which manifested apparently in May 2014, two years and ten months post-vaccination, is psychosis in the form of schizophrenia. There is a gap of two years and eight months between her medical records in 2011 and in 2014. On May 29, 2014, petitioner was hospitalized for one month for auditory, visual, and tactile hallucinations. This dramatic and unfortunate downturn in her psychiatric state could be called encephalopathy (which literally means disease of the brain), but petitioner has not filed proof that Menactra and Varicella vaccines cause psychosis nearly three years later.

Petitioner must show not only that but for her Menactra and Varicella vaccinations, she would not have schizophrenia, but also that Menactra and Varicella vaccines were substantial factors in causing schizophrenia. Shyface v. Sec'y of HHS 165 F.3d 1344, 1352 (Fed. Cir. 1999).

The Vaccine Act does not permit the undersigned to rule for petitioner based on "the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). Although petitioner submitted Dr. Mittman's report, he has zero credibility. He does not seem to understand that an allergic skin reaction to vaccines does not substantiate a claim for vaccine-caused psychosis. It does not even prove petitioner had an allergic reaction to Menactra and/or Varicella vaccines because petitioner's contemporaneous medical records do not show symptoms of an allergic reaction, as respondent's expert Dr. Josephs states. Moreover, based only on the history petitioner and her parents gave that she had numbness and tingling after vaccination, Dr. Mittman posits that petitioner had GBS and sent her for a lumbar puncture as if she still had GBS three years later. If petitioner had given Dr. Mittman her 2011 medical records, he would have seen petitioner had carpal tunnel syndrome, not GBS, and her carpal tunnel syndrome began before her vaccinations.

Dr. Mittman's opinion has no persuasive value, not only because he had no access to petitioner's contemporaneous medical records which show that all her neurological examinations were normal in 2011, except for her fingers which manifested carpal tunnel syndrome, but also because of his inability to comprehend the nonexistent connection of an alleged skin reaction to vaccine to the development of psychosis three years later. Moreover, Dr. Mittman is completely incapable of diagnosing GBS. Respondent's expert Dr. Josephs is far more persuasive in opining that petitioner's supposed skin allergy to Menactra and Varicella vaccines provides no scientific or medical theory for an allegation of vaccine-caused psychosis or even to a vaccine allergy since petitioner's contemporaneous medical records do not show she had any reaction to Menactra and Varicella vaccinations.

The undersigned **GRANTS** respondent's motion to dismiss and **DISMISSES** this case for petitioner's failure to make a prima facie case under the Vaccine Act.

## CONCLUSION

This petition is **DISMISSED**. In the absence of a motion for review filed pursuant to RCFC, Appendix B, the clerk of the court is directed to enter judgment herewith.[3]

**IT IS SO ORDERED.**

Dated: August 11, 2016

Laura D. Millman
Special Master

[3] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either jointly or separately, filing a notice renouncing the right to seek review.